# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

KARL LINDELL, aka "BLEACH"

**CRIMINAL COMPLAINT**

CASE NUMBER: **08CR 227**

MAGISTRATE JUDGE KEYS

FILED
JN 3-18-08
MAR 18 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about <u>November 3, 2007</u>, in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u>, defendant(s)

did knowingly and intentionally distribute and possess with the intent to distribute a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance;

in violation of Title <u>21</u>, United States Code, Section <u>841(a)(1)</u>.

I further state that I am a <u>Special Agent for the Federal Bureau of Investigation</u> and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof:  **X** Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

March 18, 2008                     at     Chicago, Illinois
Date                                       City and State

MAGISTRATE JUDGE ARLANDER KEYS        _____
Name & Title of Judicial Officer           Signature of Judicial Officer

STATE OF ILLINOIS   )
                    ) SS
COUNTY OF COOK      )

## AFFIDAVIT

I, Jason C. Rahoy, being first duly sworn on oath, depose and state as follows:

1.  I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since July 2006, and am presently assigned to the FBI's Joint Task Force on Gangs, Chicago Field Division. In this capacity, I have received specialized training in the enforcement of federal narcotics laws. My training and experience has involved, among other things, (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances and gang-related activity; (b) surveillance; and (c) analysis of documentary and physical evidence. I have also received training and have experience in investigations involving the interception of wire communications. Based on my training and experience as a FBI agent, I am familiar with the manner in which narcotics traffickers conduct their drug-related businesses, including the methods employed by narcotics traffickers to import and distribute narcotics, their use of telephones in furtherance of their illegal activities, and their use of coded language to refer to narcotics, drug proceeds, and other aspects of narcotics trafficking.

2.  I am responsible for investigating crimes that involve, among other things, the unlawful importation of illegal narcotics (21 U.S.C. §§ 952, 960 and 963), the possession

with the intent to distribute controlled substances and the distribution of controlled substances (21 U.S.C. §§ 841 and 846), the use of communication facilities to further these offenses (21 U.S.C. § 843(b)), as well as the related laundering of monetary instruments (18 U.S.C. §§ 1956 and 1957). In conducting these investigations, I have used a variety of investigative techniques and resources in several investigations which have included physical and electronic surveillance, monitoring court-authorized wiretaps, the use of confidential human sources ("CHSs") and informants, and securing other relevant information using other investigative techniques. Through these investigations, my training and experience and conversations with other Special Agents, as well as other law enforcement personnel, I have become familiar with methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, and to collect and launder related narcotic proceeds.

3. The following information is based upon my own personal observations, knowledge, and information received from other law enforcement officers, local law enforcement officers, and a CHS who has proven reliable and provided information which has been independently corroborated. As a result of my participation in this investigation, I am familiar with all aspects of this investigation as described in this Affidavit. Since this Affidavit is being submitted for the limited purposes of establishing probable cause that KARL LINDELL, also known as "BLEACH," violated 21 U.S.C. § 841(a)(1), it does not included each and every fact known to me concerning this investigation.

4. Based on the information contained in this Affidavit, I submit that there is

probable cause to believe that on November 3, 2007, KARL LINDELL knowingly and intentionally distributed and possessed with the intent to distribute a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

### The CHS

5. CHS has been providing reliable, timely information to the FBI since approximately June 2005. During this time, FBI Agents have spoken to CHS in person and telephonically on numerous occasions. A substantial portion of the information provided by CHS has been corroborated by independent investigation, including consensually-recorded calls with an investigative target, cocaine purchases conducted by CHS, and physical surveillance.[1]

6. On November 11, 2007, CHS identified LINDELL[2] from a CPD booking photograph. According to CHS, based on CHS's past conversations and interactions with

---

[1] CHS has at least eleven prior arrests in the Chicago area, including arrests for aggravated assault, domestic battery, and resisting a peace officer. CHS has prior convictions for violation of a protection order and telephone harassment. CHS is actively cooperating with law enforcement in hopes of receiving assistance in joining the United States military. CHS has been advised that it is unlikely that the FBI will be able to provide this type of assistance. CHS is not being paid by the FBI for CHS's cooperation with this investigation. On one occasion, while assisting with an unrelated investigation, CHS denied his/her presence at the location and time of criminal activity despite evidence to the contrary. When questioned, CHS denied any intent to deceive agents regarding his/her presence.

[2] The identification of KARL LINDELL in this Affidavit is based upon the following: First, CHS identified LINDELL by voice subsequent to the consensual recordings. Second, during a recorded conversation, CHS referred to LINDELL as "Bleach," which according to CHS is a street name for KARL LINDELL. Third, during recorded calls, LINDELL arranged to personally meet with CHS and that meeting was surveilled by agents. LINDELL was subsequently identified by agents, based on a CPD booking photograph, after review of a consensual recording, as the individual who entered CHS's vehicle.

LINDELL, LINDELL is involved in the distribution of narcotics. CHS knows LINDELL because both individuals associate with the Almighty Latin King Nation ("ALKN") street gang.

### November 3, 2007, Telephone Calls

7. On or about November 3, 2007, at approximately 3:13 p.m., at the direction of agents, CHS placed a consensually recorded telephone call to LINDELL at telephone number (312) 576-6904. During this call, CHS asked LINDELL what the final price was "on that" (2.5 ounces of crack cocaine).[3] LINDELL replied, "Give me 18 ($1,800) . . . for the two and a half (ounces of crack cocaine)." LINDELL continued, "That's all he's (LINDELL's supplier) got right now, he's been blowing me up too (calling LINDELL a lot)." CHS asked LINDELL if he could do better than "that" ($1,800). LINDELL told CHS, "I'm only making like maybe like 50-60 bucks off of it." LINDELL told CHS, "the shit's (crack cocaine) butter too. . . . They're gonna love it. You butter your muffin with it." LINDELL then told CHS that he would call "him" (LINDELL's supplier), and he (LINDELL's supplier) would meet CHS and LINDELL at LINDELL's residence.

9. At approximately 3:22 p.m., at the direction of agents, CHS placed a

---

[3] The recorded conversations throughout this Affidavit have been summarized, and parentheses have been placed around language that represent my or other agents' understanding of what is being said during the recordings, based on the contents and context of the conversations, my experience as a law enforcement officer, and the experience of other law enforcement officers in this investigation. In addition, language that is quoted from the recorded conversations throughout this Affidavit is based upon agents' review of the recorded conversations. Quoted material is not intended to be a final transcription of the audio recordings from which the quotes are taken.

consensually recorded telephone call to LINDELL at telephone number (312) 576-6904. During this call, LINDELL told CHS that he and CHS would go to "my guy's crib (LINDELL's supplier's residence) and then we'll just do it there." LINDELL explained, "cause I ain't got it (2.5 ounces of crack cocaine) on me. I got to get it from him. He's waiting on me." CHS and LINDELL agreed that the CHS would pick LINDELL up.

### November 3, 2007, Narcotics Transaction

10. On or about November 3, 2007, at approximately 5:00 p.m., agents searched CHS and CHS's vehicle. CHS had $500 USC on his/her person that agents took from him/her and held for the duration of the operation; otherwise, the results of the search were negative. Agents provided CHS with $1,800 United States Currency ("USC") to purchase two and a half ounces of crack cocaine. Agents then provided CHS with a concealed audio and video recording device.

11. CHS then departed to 1736 North Albany in Chicago, which according to CHS is LINDELL's residence. Surveillance agents ("surveillance") maintained constant surveillance of CHS while en route to 1736 North Albany, during the operation, and while returning to the predetermined post-deal meeting location.

12. At approximately 5:30 p.m., surveillance observed CHS approach the residence located at 1736 North Albany. When CHS arrived in the vicinity of 1736 North Albany, CHS called LINDELL. This call was consensually recorded. During this call, CHS asked LINDELL what street number was his address. LINDELL replied that his address was

"1736." LINDELL told CHS to meet him in the alley.

13. At approximately 5:35 p.m., surveillance observed CHS arrive behind 1736 North Albany in the alley west of the residence. According to CHS, after a few minutes, LINDELL exited 1736 North Albany. LINDELL then entered CHS's vehicle and told CHS to drive to the vicinity of Augusta and Damen.

14. At approximately 5:40 p.m., surveillance observed CHS and LINDELL depart from 1736 North Albany in CHS's vehicle. Surveillance agents observed CHS and LINDELL travel in CHS's vehicle to the vicinity of Augusta and Damen, Chicago, Illinois.

15. While en route to August and Damen, CHS told LINDELL he/she thought LINDELL had "the stuff" (crack cocaine). LINDELL replied, "No, he ain't gonna let me hold it like that. . . . They don't let me hold it (crack cocaine)."

16. LINDELL directed CHS to double-park on West Augusta east of Wood Street. Surveillance agents observed CHS parked on West Augusta, east of Wood Street, at approximately 1744 West Augusta. LINDELL then asked CHS about the money, and CHS told LINDELL to count it. CHS gave LINDELL the money, and LINDELL told CHS that he trusted CHS.

17. At approximately 5:53 p.m., surveillance observed LINDELL exit CHS' vehicle, and enter a residence at approximately 1744 West Augusta through the front door under a maroon awning.

18. At approximately 6:01 p.m., surveillance observed LINDELL exit the residence

6

at approximately 1744 West Augusta and enter CHS' vehicle.

19. At approximately 6:02 p.m., surveillance observed CHS and LINDELL depart the vicinity of 1744 West Augusta in CHS's vehicle, and travel to 1736 North Albany.

20. According to CHS, while inside his/her vehicle, LINDELL provided CHS a plastic baggy containing multiple, smaller plastic baggies, each containing an off-white, rocky substance. LINDELL told CHS, "this shit (the crack cocaine LINDELL provided CHS) going like hotcakes." LINDELL instructed CHS to "put it (the crack cocaine) in your stash wherever your stash is . . . . I know you got one, just make sure the bag don't open up, because there's like . . . four eightballs (1/8 ounce quantity) broken down into eightballs and there's two ounces . . . and four eightballs." CHS drove LINDELL back to 1736 North Albany.

21. At approximately 6:12 p.m., surveillance observed CHS behind 1736 North Albany. CHS dropped LINDELL off in the alley behind 1736 North Albany. The CHS then drove to the pre-determined meeting location.

22. At approximately 6:22 p.m., CHS met agents, and provided agents with one plastic baggie containing six plastic baggies, each containing an off-white rocky substance that CHS identified as the narcotics LINDELL provided CHS. Agents again searched CHS and CHS' vehicle with negative results.

23. The plastic baggie containing suspected narcotics provided to CHS by LINDELL was submitted to the Drug Enforcement Administration laboratory where it tested

Case 1:08-cr-00227 Document 1 Filed 03/18/2008 Page 9 of 9

positive for cocaine base, and was found to weigh 69.0 grams.

Based on the foregoing, I believe there is probable cause that on November 3, 2007, KARL LINDELL knowingly and intentionally distributed and possessed with the intent to distribute a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, in violation Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_____
Jason C. Kahoy, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 18th day of March, 2008.

_____
ARLANDER KEYS
MAGISTRATE JUDGE

8